**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————

**IN RE Eaton Vance Mutual Funds Fee**
**Litigation,**

This document relates to: ALL ACTIONS


————————————————————————————

**04 Civ. 1144 (JGK)**

**OPINION & ORDER**


**JOHN G. KOELTL, District Judge:**

The plaintiffs bring this action under the Investment

Company Act of 1940, 15 U.S.C. § 80a-1 <u>et</u> <u>seq.</u> (the "ICA"), New

York General Business Law § 349 ("N.Y. Gen. Bus. L. § 349"), and

under state common law for unjust enrichment and for breach of

fiduciary duty. The plaintiffs bring these claims against

nominal defendants the Eaton Vance Funds, and against defendants

Eaton Vance, its wholly owned subsidiary Eaton Vance, Inc.

("EV"), and Lloyd George Management (B.V.I.) Limited ("LGML").

The plaintiffs also bring these claims against Eaton Vance

Management ("EVM"), Boston Management and Research ("BMR"),

OrbiMed Advisors LLC ("Orbimed"), and Lloyd George Investment

Management (Bermuda) Limited ("LGM") (collectively, the

"Investment Adviser Defendants"), and against Eaton Vance

Distributors, Inc. ("EVD"), John Doe defendants, and the

1

directors, officers, and trustees of the Eaton Vance Funds. The plaintiffs seek to bring these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a class consisting of all persons or entities who held shares, units, or like interests in any of the Eaton Vance Funds between January 30, 1999, and November 17, 2003, inclusive (the "class period"), and who were allegedly damaged by thereby. No class has yet been certified.

The plaintiffs also bring a derivative claim against the Investment Adviser Defendants on behalf of the Eaton Vance Funds for violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq. (the "IAA").

The defendants move to dismiss all claims pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(6), and 23.1. Nominal defendants the Eaton Vance Funds move to dismiss the plaintiffs' first, second, fourth, seventh, ninth, and tenth causes of action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that these causes of actions should have been brought as derivative claims, and move to dismiss the plaintiffs' fifth cause of action for failure to comply with Federal Rule of Civil Procedure 23.1.

The plaintiffs move to strike material in the papers supporting the defendants' motions to dismiss that the defendants did not previously raise in their pre-motion letters.

I.

**On a motion to dismiss, the allegations in the complaint are
accepted as true**. See Grandon v. Merrill Lynch & Co., 147 F.3d
184, 188 (2d Cir. 1998). In deciding a motion to dismiss, all
reasonable inferences are drawn in the plaintiffs' favor. See
Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.
1995); Cosmas v, Hassett, 886 F.2d 8, 11 (2d Cir. 1989); see also
Marcus v. Frome, 329 F.Supp.2d 464, 468 (S.D.N.Y. 2004).

On a motion to dismiss pursuant to Rule 12(b)(6), the
Court's function is "not to weigh the evidence that might be
presented at trial but merely to determine whether the complaint
itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059,
1067 (2d Cir. 1985). Therefore, the defendants' motion to
dismiss for failure to state a claim should only be granted if it
appears that the plaintiffs can prove no set of facts in support
of his claim that would entitle him to relief. See Swierkiewicz
v. Sorema N.A., 534 U.S. 506, 513-14 (2002); Conley v. Gibson,
355 U.S. 41, 45-46 (1957); Grandon, 147 F.3d at 188; Goldman, 754
F.2d at 1065. In deciding the motion, the Court may consider
documents that are referenced in the complaint, documents that
the plaintiffs relied on in bringing suit and that are either in
the plaintiffs' possession or that the plaintiffs knew of when

bringing suit, or matters of which judicial notice may be taken. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Marcus, 329 F.Supp.2d at 468; VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F.Supp.2d 435, 437 (S.D.N.Y. 2001).

## II.

Nominal defendants, the Eaton Vance Funds, are a series of various Eaton Vance business trusts organized under Massachusetts law. (Second Amended Complaint, filed Aug. 26, 2004 ("SAC") ¶ 21.) Each trust has a board of trustees responsible for the trust's administration. (Id.) Each of the Eaton Vance Funds is a mutual fund in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities. (Id.) Shares of the Eaton Vance Funds are issued to investors pursuant to prospectuses that must comply with federal securities law. (Id.) During the class period, the Eaton Vance Funds used a system in which funds with substantially identical investment objectives ("Feeder Funds") pooled their assets by investing in common portfolios (the "Master Funds" or "Eaton Vance Portfolios"). (Id. ¶ 22.)

Each Master Fund, with the exception of funds managed by LGM or Orbimed, entered into an investment advisory agreement with defendants EVM or BMR. (Id.) The investment adviser for each

Eaton Vance Portfolio, with the aid of the Portfolio Manager, invests the Portfolio's assets in securities consistent with the investment goals of the individual Eaton Vance Fund. (Id.) For most Eaton Vance Funds, each Fund invests its shareholders' assets in a single, corresponding Eaton Vance Portfolio. (Id., ¶ 24.) Each Eaton Vance Portfolio has a board of trustees charged with the overall management and supervision of the Portfolio, and often shares trustees with its corresponding Eaton Vance Fund. (Id., ¶ 23.) All Eaton Vance Funds share EVM, BMR, OrbiMed, or LGML as their investment adviser and share EVD as their principal underwriter and distributor. (Id., ¶ 26.) Moreover, defendant Eaton Vance pools together the fees collected from Eaton Vance Funds investors, resulting in the Eaton Vance Funds sharing expenses. (Id.) During the class period, the defendants used a series of combined prospectuses (the "Prospectuses") whereby several Eaton Vance Funds were reported in one Prospectus. (Id. ¶ 109.)

Defendant Eaton Vance is the parent company of the Investment Advisers EVM and BMR, defendants EV and EVD, and all of the Eaton Vance Funds. (Id., ¶ 28.) Defendant EV served as trustee of the Eaton Vance Funds and the investment advisers EVM and BMR. Eaton Vance also owns a significant interest in defendant LGML, the parent company of defendant LGM. (Id., ¶¶ 29, 30.)

The Investment Adviser Defendants, EVM, BMR, Orbimed, and
LGM, are registered investment advisers under the IAA. (Id., ¶¶
31-34.)  EVM and BMR managed and advised all of the Eaton Vance
Funds except those managed by OrbiMed and LGM.  (Id., ¶¶ 31-32.)
However, pursuant to agreements with OrbiMed and LGM, EVM and
BMR, as investment advisers to the Eaton Vance Funds, provided
overall investment management services to each of the Master
Funds, subject to the supervision of each Fund's board of
trustees.  (Id.)  EVM and BMR also served as administrators or
managers to all of the Easton Vance Funds, and were responsible
for managing the business affairs of all Eaton Vance Funds,
subject to the oversight of each Fund's board of trustees.  (Id.)

The Investment Adviser Defendants had the ultimate
responsibility for overseeing the day-to-day management of the
Eaton Vance Funds.  (Id. ¶ 35.)  Pursuant to their advisory
agreements with the Eaton Vance Portfolios, the Investment
Adviser Defendants provide the Eaton Vance Portfolios with
research, advice, and supervision with respect to investment.
(Id. ¶ 36.)  The Investment Adviser Defendants are also
responsible for selecting the broker-dealers through which the
Eaton Vance Portfolios will execute their securities
transactions, and for negotiating the terms of the agreements
with those broker-dealers.  (Id.)  Fees payable to the Investment

Adviser Defendants are calculated as a percentage of assets under management. (Id. ¶ 35.)

The Second Amended Complaint (the "SAC") names as defendants twenty-one directors, officers, and trustees of the Eaton Vance Funds (the "Trustee Defendants"). (Id., ¶¶ 37-58.) The Trustee Defendants were charged with overseeing Eaton Vance Portfolios, including both the Master Funds and corresponding Eaton Vance Funds. (Id.)

Defendant EVD is EVM's wholly-owned broker-dealer, and is registered under the Securities Exchange Act of 1934 (the "Exchange Act"). (Id., ¶ 59.) During the class period, EVD marketed and sold the Eaton Vance Funds as the Funds' principal underwriter, and promoted and provided information regarding the portfolio management services of the Investment Adviser Defendants to unaffiliated third-party broker-dealer firms. (Id.) EVD also implemented Rule 12b-1 distribution plans, described below, between EVD and the Eaton Vance Funds. (Id.)

The plaintiffs held shares or units of Eaton Vance Funds during the class period and allege that they were damaged by the defendants' allegedly improper conduct. (Id. ¶¶ 14-20.) The plaintiffs bring all but one of their claims as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class "consisting of all persons or entities who held shares, units, or like interests in any of the

Eaton Vance Funds between January 30, 1999, and November 17, 2003, inclusive, and who were damages thereby (the "Class"). (Id. ¶ 120.) The defendants, members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which the defendants have or had a controlling interest, are excluded from the Class. (Id.)

The plaintiffs allege that the defendants used improper means to acquire "shelf-space" at brokerage firms. The plaintiffs allege that Eaton Vance used the assets of its mutual fund investors to pay excessive commissions to brokers to induce the brokers to market aggressively Eaton Vance mutual funds to new investors. (Id. ¶¶ 61-65.) For example, through a program with Morgan Stanley (the "Partner Program"), Morgan Stanley adopted a broker "Incentive Compensation" payout grid that provided up to 3% greater compensation for "asset-based products" such as Eaton Vance funds, as opposed to "transaction based products," funds that were not part of the Partner Program. (Id. ¶ 65.) Morgan Stanley management also gave Eaton Vance Funds priority placement in the review of fund materials to be distributed to Morgan Stanley brokers, gave Eaton Vance access to Morgan Stanley brokers, and invited Eaton Vance to participate in programs broadcast to brokers over Morgan Stanley's internal systems. (Id.) Morgan Stanley has since been fined and censured by the Securities and Exchange Commission (the "SEC") and the

National Association of Securities Dealers, Inc. (the "NASD") and has agreed to pay fines totaling $50 million. (<u>Id.</u> ¶ 75-77.)

The plaintiffs allege that, according to a former Eaton Vance senior manager who worked at Eaton Vance during the class period, Eaton Vance entered into "revenue sharing" arrangements through which Eaton Vance made payments to brokerage houses in order to induce brokers to direct investors to invest in Eaton Vance Funds. (<u>Id.</u> ¶ 69.) The revenue sharing plan required Eaton Vance to pay an additional ten to twenty-five basis points override on gross sales to brokerage houses in return for the brokerages encouraging investors to invest in Eaton Vance Funds. (<u>Id.</u> ¶ 70.) The plaintiffs also allege that Eaton Vance issued improper payments to brokerage houses labeled as "meeting support" or "meeting fees" in return for the brokerage houses encouraging investors to invest in Eaton Vance funds. (<u>Id.</u> ¶ 71.) The plaintiffs allege that this meeting support or meeting fees payments came in the form of payments as high as $60,000 to brokerage firms and luxury outings for brokers, and often required that the Eaton Vance home office grant permission for the payments. (<u>Id.</u> ¶¶ 71-72.)

Eaton Vance funds also had plans for distributing or marketing their own shares ("Rule 12b-1 plans") pursuant to Rule 12b-1. Rule 12b-1, which was promulgated by the SEC pursuant to the ICA, prohibits mutual funds from directly or indirectly

distributing or marketing their own shares unless certain enumerated conditions are met.  <u>See</u> 17 C.F.R. § 270.12b-1 (1999) ("Rule 12b-1").  These conditions require, among other things, that: payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution"; all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made."  Rule 12b-1(b).

Rule 12b-1 also provides that, in considering whether a registered open-end management investment company should implement or continue a plan, "the directors of such company shall have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued . . . ."  Rule 12b-1(d).  The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b)

of the [ICA] that there is a reasonable likelihood that the plan
will benefit the company and its shareholders."  Rule 12b-1(e).

During the class period the net assets for the Eaton Vance
World Wide Health Sciences Fund increased from $418 million to
$985 million.  (SAC ¶ 91.)  The net asset value per share of the
fund decreased by more than 24%, falling from $12.33 per share at
the end of the fiscal year 2000 to $9.36  per share at the end of
the fiscal year 2003.  (Id.)  During this period, the ratio of
expenses to net assets increased from 1.79% in 2000 to 1.81% in
2003, and the total fees, including management fees, collected by
Eaton Vance for all of the Funds during the class period
increased 37% from $173 million to over $237 million.  (Id.)  At
no point during the class period were the 12b-1 fees reduced as
the assets of the funds increased.  (Id. ¶ 92.)  These
reductions, known as "breakpoints," may be implemented because,
as fund assets increase, certain fixed costs remain the same,
reducing the overall costs per shareholder.  (Id.)

While financial advisers generally owe fiduciary duties to
their clients that require that they obtain the best possible
execution price for their trades, the Section 28(e) "safe harbor"
provision of the Exchange Act carves out an exception to this
rule.  15 U.S.C.§ 78bb(e).  Section 28(e) provides that fund
managers shall not be deemed to have breached their fiduciary
duties "solely by reason of [their] having caused the account to

pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such . . . broker . . . ." 15 U.S.C. § 78bb(e)(1).  This provision allows funds to include in their commissions payment for specified services in addition to the purchase and sales execution, including "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities."  (SAC ¶ 98.)  The commission amounts that brokerages charge investment advisers in excess of the purchase and sales charges are known as "soft dollars."  (<u>Id.</u>)  The Investment Adviser Defendants paid soft dollars to brokerages in the form of commissions and overhead costs for items such as computer hardware and software.  (<u>Id.</u> ¶ 99.)

The plaintiffs initiated this action by filing five separate complaints.  (Complaint, filed Feb. 11, 2004; Complaint filed Feb. 26, 2004; Complaint filed Mar. 1, 2004; Complaint filed Mar. 3, 2004; Complaint filed April 12, 2004.)  On April 27, 2004, the Court issued an Order directing the plaintiffs to file a consolidated amended complaint (the "Consolidated Amended Complaint"), and directing the defendants to outline their objections to the Consolidated Amended Complaint in letters to

the plaintiffs' counsel. (Order dated Apr. 27, 2004, at 5.) The
Order stated that the plaintiffs, within thirty days of receiving
these letters, should either file a second amended complaint or
inform defense counsel that it intended to stand on its
Consolidated Amended Complaint. (Id.) The plaintiffs filed the
Consolidated Amended Complaint on June 9, 2004, and the
plaintiffs submitted letters in response to the Consolidated
Amended Complaint on July 12, 2004. (Memorandum of Law in
Support of Plaintiffs' Motion to Strike Material Not Previously
Raised in Defendants' Pre-Motion Letters, filed Jan. 12, 2005
("Strike Mem."); Memorandum of Law in Opposition to Plaintiff's
Motion to Strike Material Not Previously Raised in Defendants'
Pre-Motion Letters, filed Mar. 8, 2005 ("Opp. to Strike") at 1.)
After reviewing the letters, the plaintiffs filed the SAC on
August 26, 2004. (SAC.)

The SAC's first cause of action (Count One) is brought
against the Investment Adviser Defendants and Trustee Defendants
on behalf of the Class for violation for § 34(b) of the ICA ("§
34(b)"), 15 U.S.C. § 80a-33(b), alleging that the Investment
Adviser Defendants and Trustee Defendants made misrepresentations
and omissions of material facts in registration statements and
reports filed and disseminated pursuant to the ICA. Count One
alleges that the Investment Adviser Defendants and Trustee
Defendants failed to disclose: the nature and extent of the

payments that the Investment Adviser Defendants authorized in the form of excessive commissions to brokers; that such payments violated Rule 12b-1; "that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements"; that the Eaton Vance Funds Rule 12b-1 Plans violated the requirements of Rule 12b-1; that by paying brokers to steer clients to Eaton Vance Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties and profiting from the brokers' improper conduct; that any economies of scale achieved by marketing the Eaton Vance Funds to new investors were not passed on to Eaton Vance Funds investors; that the defendants improperly used soft dollars and excessive commissions, paid from Eaton Vance Funds assets, to pay for overhead expenses "the cost of which should have been borne by Eaton Vance and not Eaton Vance investors"; that the Trustee Defendants failed to monitor and supervise the Investment Adviser Defendants as they were required to under the ICA and their common law fiduciary duties; and that, as a result, the Investment Adviser Defendants were able to "skim millions of dollars from the Eaton Vance Funds investors."  (SAC ¶¶ 127-33.)

The plaintiffs bring the second and third causes of action ("Count Two" and "Count Three," respectively), on behalf of the Class, against the EVD, the Investment Adviser Defendants and the

Trustee Defendants for violation of §§ 36(a) and (b) of the ICA ("§ 36(a)" and "§ 36(b)"), 15 U.S.C. §§ 80a-35(a) and (b), respectively). (Id. ¶¶ 134-48.) Counts Two and Three allege that EVD, the Investment Adviser Defendants, and the Trustee Defendants breached their fiduciary duties as defined by §§ 36(a) and (b) by improperly charging investors in the Eaton Vance Funds purported 12b-1 marketing fees, and by drawing on the assets of the Eaton Vance Fund investors to make undisclosed payments of soft dollars and excessive commissions, in violation of Rule 12b-1. (Id.) Count Two seeks to enjoin the defendants from engaging in such practices in the future and Counts Two and Three seek to recover improper Rule 12b-1 fees, soft dollars, excessive commissions, and the management fees that EVD, the Investment Adviser Defendants, and the Trustee Defendants charged the Eaton Vance Funds. (Id. ¶¶ 140, 148.)

The plaintiffs brings the fourth cause of action ("Count Four"), on behalf of the Class, against Eaton Vance, EV, EVM, and LGML for violation of § 48(a) of the ICA ("§48(a)"), 15 U.S.C. § 80a-47(a), alleging that these defendants caused the Investment Adviser Defendants to violate §§ 34(b) and 36(a) and (b) of the ICA as set forth under Counts One, Two, and Three. (Id. ¶¶ 149-55.)

The fifth cause of action ("Count Five") is a derivative action brought on behalf of the Eaton Vance Fund against the

Investment Adviser Defendants under § 215 of the IAA ("§ 215"), 15 U.S.C. § 80b-15, for a violation of § 206 of the IAA ("§ 206"), 15 U.S.C. § 80b-6.  (Id. ¶¶ 156-63.)  Count Five alleges that the Investment Adviser Defendants breached their fiduciary duties to the Eaton Vance Portfolios and the Eaton Vance Funds by "engaging in a deceptive contrivance" through which they "knowingly and/or recklessly engaged in acts . . . which operated as a fraud upon the Eaton Vance Portfolios and Eaton Vance Funds" by engaging in the actions alleged in Counts One through Three. (Id. ¶¶ 159-61.)  Count Five seeks to rescind the investment adviser contracts between the Investment Adviser Defendants and the Eaton Vance Portfolios and Eaton Vance Funds, and to recover all fees paid by the Eaton Vance Funds in connection with the contracts.  (Id. ¶ 163.)

The sixth cause of action ("Count Six") is brought against all defendants on behalf of the Class for violation of N.Y. Gen. Bus. L. § 349.  (Id. ¶ 165.)  Count Six alleges that the defendants made misrepresentations or omissions to the plaintiffs and the Class that were unfair and deceptive when made, and that were made with the intent to, and did, deceive the plaintiffs and the Class and induce them to hold the Funds and to pay excessive and undisclosed fees in violation of N.Y. Gen. Bus. L. § 349. (Id. ¶¶ 164-68.)

The seventh, eight, and ninth causes of action ("Count Seven," "Count Eight," and "Count Nine," respectively) are brought by the plaintiffs on behalf of the Class for breach of fiduciary duties under common law. (Id. ¶¶ 169-88.) Count Seven is brought against the Investment Adviser Defendants, Count Eight is brought against the Trustee Defendants, and Count Nine, for aiding and abetting breaches of fiduciary duties, is brought against all defendants. (Id.) The tenth cause of action ("Count Ten") is brought against all defendants on behalf of the Class alleging unjust enrichment under common law. (Id. ¶¶ 187-88.)


                              III.

     The plaintiffs move to strike material in the defendants' memoranda in support of their motions to dismiss that was not previously raised in the defendants' pre-motion letters submitted in response to the Consolidated Amended Complaint.

     The Motion to Strike is without merit. The procedure by which the Court required the defendants to issue their objections to the Consolidated Amended Complaint was adopted to allow the plaintiffs to file the Second Amended Complaint and avoid a situation in which, had they been aware of the arguments made in the plaintiffs' letters, they would have amended their Consolidated Amended Complaint. The plaintiffs concede that many of the arguments raised in the defendants' motions to dismiss

were raised as objections to the Consolidated Amended Complaint, but argue that these objections were too vague to provide them with notice of the defendants' current arguments. (Reply Memorandum in Further Support of Plaintiffs' Motion to Strike Material Not Previously Raised in Defendants' Pre-Motion Letters, filed Mar. 22, 2005 ("Strike Reply") at 2-4.) However, the Order directing the defendants to submit their objections to the Consolidated Amended Complaint did not require the defendants to provide exhaustive arguments as to why the causes of action asserted against them were deficient, or to provide all details supporting the arguments submitted. (Order dated Apr. 27, 2004.) In any event, the plaintiffs have not demonstrated how they would have cured the legal problems alleged in the defendants' current motions to dismiss. Moreover, the plaintiffs do not dispute that they have had the full opportunity to brief all of the issues in the motion to dismiss. (Transcript of oral argument held July 8, 2005 ("Tr.") at 57.) The motion to strike is therefore denied.

IV.

A.

The defendants argue that Counts One, Two, and Four must be dismissed because there are no private rights of action under §§

18

34(b), 36(a), or 48(a).  In <u>Olmsted v. Pruco Life Insurance Co.</u>,

283 F.3d 429 (2d Cir. 2002), the Court of Appeals for the Second

Circuit held that there was no private right of action under §§

26(f) and 27(i) of the ICA, 15 U.S.C. §§ 80a-25(f) and 80a-26(i).

<u>Olmsted</u>, 283 F.3d at 433.  The Court of Appeals found that

Congress did not intend to create such a private right of action,

particularly in view of the absence of an explicit private right

of action in those sections and the provision in § 42 of the ICA,

15 U.S.C. § 80a-41, for enforcement of all ICA provisions by the

SEC through investigations and civil suits for injunctions and

penalties.  <u>Id.</u> at 432-33.  While the Court of Appeals has not

indicated whether its decision in <u>Olmsted</u> precludes private

rights of action under §§ 34(b), 36(a), and 48(a), the reasoning

of that decision dictates that there are no private rights of

action under those sections of the ICA.

Relying on the reasoning in the Supreme Court's opinion in

<u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001), the Court of Appeals

in <u>Olmsted</u> outlined the following factors it found determinative

in whether a private right of action existed under the provisions

of the ICA: 1) whether the provision explicitly provides a

private right of action; 2) whether the provision contains

"rights-creating language" for those protected under the statute;

3) whether the statute has provided an alternative method of

enforcement; and 4) whether Congress provided a private right of

action for enforcement of any other section of the statute.

Olmsted, 283 F.3d at 432-34.

These factors indicate that Congress did not intend to create a private right of action for the enforcement of §§ 34(b), 36(a), and 48(a) for a violation of §§ 34(b) and 36(a).  None of these sections explicitly provides for a private right of action.[1]  Moreover, the sections do not contain "rights-creating

---

[1] Section 34(b) of the ICA provides that: "It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter or the keeping of which is required pursuant to section 80a-30(a) of this title. It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading. For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document."  15 U.S.C.A. § 80a-33(b).

Section 36(a) of the ICA provides that: "The Commission is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts--

   (1) as officer, director, member of any advisory board, investment adviser, or depositor; or
   (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80(a)-1b of this title."  15 U.S.C.A. § 80a-35(a).

Section 48(a) of the ICA provides that: "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order

language" — rather, they describe prohibited actions and, in the case of § 36(a), specifically authorize the SEC to take action to enforce the provision. Moreover, the statute provides an alternative method of enforcement for these provisions through § 42 of the ICA, which authorizes the SEC to enforce all provisions of the ICA. Thus, the <u>Olmsted</u> Court's reasoning that "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others" is equally applicable to §§ 34(b), 36(a), and 48(a) of the ICA. <u>See</u> <u>Olmsted</u>, 283 F.3d at 433 (quoting <u>Alexander</u>, 532 U.S. at 290). Moreover, Congress provided a private right of action for enforcement of § 36(b) of the statute,[2] supporting the argument that, "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional." <u>Id.</u> at 433.

---

thereunder." 15 U.S.C.A. § 80a-47(a).

[2] Section 36(b) provides, in relevant part: "For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person." 15 U.S.C. § 80a-35(b).

The absence of rights-creating language, the existence of an alternative method of enforcement, and the existence of an explicit private right of action for another provision of the statute creates the strong presumption that Congress did not intend to create private rights of action under §§ 34(b), 36(a), or 48(a).  See Chamberlain v. Aberdeen Asset Management Ltd., No. 02 Civ. 5870, 2005 WL 195520, at *2-*4 (E.D.N.Y. Jan. 21, 2005) (applying Olmsted to § 36(a) and finding no private right of action) (vacated pursuant to settlement); In re Merril Lynch & Co., Inc. Research Reports Securities Litigation, 272 F.Supp.2d 243, 255-59 (S.D.N.Y.  2003) (applying Olmsted to § 34(b) and finding no private right of action).

The plaintiffs cite various decisions that are not dispositive.  In Scalisi v. Fund Asset Mgmt, L.P., 380 F.3d 133, 136 n.4 (2d Cir. 2004), the Court of Appeals expressly declined to reach the question of whether § 36(a) creates a private right of action.  The Court of Appeals decision in Strougo v. Bassini, 282 F.3d 162 (2d Cir. 2002) was issued shortly before its decision in Olmsted and, while it finds that the plaintiffs could pursue claims under §§ 36(a), 36(b), and 48, it appears to assume without discussion that such private rights of action exist under §§ 36(a) and 48.[3]  See Chamberlain, 2005 WL 195520 at *4 (noting

---

[3] There is an explicit private right of action under § 36(b).

tension between Strougo and Olmsted but finding later issued opinion in Olmsted to be dispositive).

Two earlier opinions of the Court of Appeals are also not dispositive.  In Fogel v. Chestnutt, 533 F.2d 731 (2d Cir. 1975), the Court of Appeals assumed that there was a private right of action against investment advisers and directors of the advisers under the ICA for breach of fiduciary duty, and remanded the case for a computation of damages.  In a subsequent appeal, after a computation of damages, the Court of Appeals concluded that its prior assumption was the law of the case, despite the new argument that there was no private right of action under the ICA for such violations.  The Court of Appeals concluded: "While we recognize that the question of the existence of a private cause of action under the ICA has become more debatable than we or the defendants thought in 1975, we thus perceive no justification for departure from the law of the case."  Fogel v. Chestnutt, 668 F.2d 100, 112 (2d Cir. 1981).  Over twenty years later, Olmsted, the Court of Appeals cast some doubt even on the assumptions in Fogel: "[I]n Fogel we merely assumed that when Congress added § 36(b) of the ICA in 1970 it did not intend to overrule previous decisions recognizing implied rights of action in the statute . . . .  We express no opinion on the current validity of our assumption in Fogel."  Olmsted, 283 F.3d at 433 n.3.

Most significantly, the <u>Olmsted</u> decision addressed the "long line of decisions recognizing implied private rights of action" under the ICA, noting that they were decided when "courts had more latitude to weigh statutory policy and other considerations than they do now." <u>Olmsted</u>, 283 F.3d at 433-34. Following the <u>Olmsted</u> decision, the parties have pointed to no opinion in this Circuit that has considered <u>Olmsted</u> and found that Congress intended to create a private right of action under §§ 34(b), 36(a), or 48(a). Moreover, two well-reasoned decisions from district courts in this Circuit, citing <u>Olmsted</u>, have rejected the argument that Congress intended to create a private right of action under §§ 34(b) and 36(a). <u>See</u> <u>Chamberlain</u>, 2005 WL 195520, at *2-*3; <u>Merrill Lynch</u>, 272 F.Supp.2d at 255-59. The reasoning of <u>Olmsted</u> dictates that there is no private right of action under §§ 34(b), 36(a), and 48(a).

Therefore, Counts One, Two, and Four are dismissed for failure to state a claim upon which relief can be granted.

B.

The defendants and nominal defendants also move to dismiss Counts One, Two, Four, Seven, Eight, Nine, and Ten pursuant to Rule 12(b)(6) on the ground that the claims should have been brought as derivative actions.

Under Massachusetts law,[4] to determine whether a claim
should be brought through a derivative suit, a court must
determine whether the plaintiff has alleged "an injury distinct
from that suffered by shareholders generally or a wrong involving
one of his or her contractual rights as a shareholder, such as
the right to vote." <u>Lapidus v. Hecht</u>, 232 F.3d 679, 683 (9th
Cir. 2000) (applying Massachusetts law); <u>see also</u> <u>Green v. Nuveen
Advisory Corp.</u>, 186 F.R.D. 486, 489 (N.D. Ill. 1999) ("To
determine whether a claim belongs to the corporation, a court
must inquire whether the shareholder's injury is distinct from
the injury suffered generally by the shareholders as owners of
corporate stock.") (applying Massachusetts law); <u>see</u> <u>Jackson v.
Stuhlfire</u>, 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1990).  If the
wrong underlying the claim adversely affects the plaintiffs
"merely as they are the owners of the corporate stock," then the
injury to the shareholder is considered indirect, and the suit
must be brought as a derivative action because "only the
corporation itself suffers the direct wrong."  <u>Jackson</u>, 547

---

[4] Counts One, Two, and Four are brought pursuant to the ICA.  Therefore, in
determining whether the claims are properly brought as derivative or direct,
the Court looks to the law of the state in which the investment company is
incorporated.  <u>See</u> <u>Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 108-09
(1991).  Here, the Eaton Vance Funds are organized under Massachusetts law,
and thus this Court looks to Massachusetts law.  The parties do not dispute
that Massachusetts law should also be applied to determine whether Counts
Seven, Eight, Nine, and Ten, which are asserted under state common law, must
be brought as derivative claims, and the Court can accept the agreement of the
parties.  <u>See</u> <u>Hannex Corporation v. GMI, Inc.</u>, 140 F.3d 194, 203 n.7 (2d Cir.
1998); <u>Bhandari v. Trustees of Columbia University</u>, No. 00 Civ. 1753, 2000 WL
310344, at *5 n.1 (S.D.N.Y. Mar. 27, 2000).

N.E.2d at 1148 (internal quotation marks and citations omitted).

Here, Counts Two, Four, Seven, Eight, Nine, and Ten must be brought as derivative claims. All of these claims assert that the defendants improperly managed the Eaton Vance Funds, using assets and fees paid to the Funds improperly. In general, a "complaint alleging mismanagement or wrongdoing on the part of corporate officers or directors normally states a claim of wrong to the corporation: the action, therefore, is properly derivative." Id. (internal quotation marks and citations omitted).

Moreover, the injury asserted – the misuse of Eaton Vance Funds' assets to provide excessive compensation to brokers, improper 12b-1 plans, and soft dollar compensation to brokers – is an injury to the Eaton Vance Funds that adversely affects the plaintiffs only indirectly through their status as investors in the Eaton Vance Funds. The plaintiffs are damaged indirectly because the assets of the Funds are reduced. Although the Complaint claims that "the Investment Advisers and/or the Distributor Defendant compensated themselves out of investor assets," that the defendants used Eaton Vance Funds assets to pay for expenses that "should have been paid for by Eaton Vance and not the Eaton Vance investors," and that the Investment Adviser Defendants "skim[med] millions of dollars from the Eaton Vance

investors," (Compl. ¶ 129.), these claims are really allegations that the defendants used fees that were paid from Eaton Vance Fund Assets to compensate brokers for steering more investors toward the Funds, and that the Investment Adviser defendants benefited from the resulting increase in the Funds' net assets because their fees are calculated as a proportion of Fund assets. (Tr. at 71, 73, 76-78.)  The shareholders therefore did not pay the fees at issue directly, but were affected indirectly because the fees were paid out of Fund assets.  (Id.)  Therefore, any claim resulting from these alleged actions belongs to the Eaton Vance Funds, and must be brought through a derivative action. See Lapidus, 232 F.3d at 683 (applying Massachusetts law); Green, 186 F.R.D. at 490 (finding that, under Massachusetts law, claim against fund adviser under §§ 8(e), 34(b), and 36(a) of the ICA could not be brought as class action and must be brought derivatively); Jackson, 547 N.E.2d at 1148.  Therefore, Counts Two, Four, Seven, Eight, Nine, and Ten fail to state a claim upon which relief can be granted and must be dismissed pursuant to Rule 12(b)(6).

The plaintiffs argue that these claims are properly brought as direct claims because they involve duties owed directly to the plaintiffs as opposed as to the Eaton Vance Funds.  (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, filed Jan. 12, 2005 ("Opp. Mem."), at 17-25.)  The plaintiffs

argue that, in order to determine whether a claim is derivative
or direct, Massachusetts law requires that courts determine
whether the duty allegedly breached was owed to the corporation
or to the shareholder, rather than whether the shareholder's
injury is separate and distinct from the injury to the
corporation.  (Id. at 17-23.)  However, the plaintiffs provide no
cases under Massachusetts law that reject the indirect injury
test.

The cases under Massachusetts law that the plaintiffs cite
to support their argument that the derivative or direct nature of
a claim depends on a determination of to whom the duty at issue
is owed, Blasberg v. Oxbow Power Corporation and Branch v. Ernst
& Young, are consistent with the indirect injury test because in
both cases the courts recognized that a breach of a duty owed to
a corporation must be addressed through a derivative claim rather
than a direct claim because "the harm to the investor flows
through the corporation," and thus the injury to the investor is
only indirect.  See Blasberg v. Oxbrow Power Corp., 934 F.Supp.
21, 26 (D. Mass. 1996) (internal quotation marks and citation
omitted); Branch v. Ernst & Young, No. Civ. A. 93-10024-RGS, 1995
WL 791941, at *4 (D. Mass. 1995). Moreover, in Blasberg, the
court noted that "if a plaintiff alleges mismanagement of funds .
. . or breach of fiduciary duty resulting in a diminution of the
value of the corporate stock or assets, the claim is one held by

the corporation itself, and is thus derivative if brought by an
investor [because the] plaintiff's injury would accrue due to his
role as investor in the corporation, in the form of a loss in
investment value." Blasberg, 934 F.Supp. at 26. In any event,
even under the test advocated by the plaintiffs, Counts Two,
Four, Seven, Eight, Nine, and Ten, must still be brought as
derivative claims because these Counts allege breaches of
fiduciary duties owed to the plaintiffs only through their status
as investors. See Blasberg, 934 F.Supp. at 26 (noting that
direct claim must be result of right that "flows from the breach
of a duty owed directly to the plaintiff independent of the
plaintiff's status as a shareholder, investor, or creditor of the
corporation") (citing Branch, 1995 WL 791941 at *4).[5]

The plaintiffs also argue that these claims are properly
asserted as direct claims because they are specific to certain
classes of shareholders; while the 12b-1 fees are paid out of

---

[5] Although in their papers, the defendants argue that Count One also should
have been brought as a derivative claim, at oral argument, counsel for the
defendants Eaton Vance, EV, EVM, BMR, EVD, James B. Hawkes, LGML, LGM, Thomas
E. Faust, Jr., Thomas J. Fetter, Michael R. Mach, Judith A. Saryan, Cynthia A.
Clemson, Robert B. MacIntosh, Duncan W. Richardson, William H. Ahern, Jr.,
Scott H. Page, Michael W. Weilheimer, Payson F. Swaffield, and Edward E.
Smiley, Jr. understandably conceded that Count One is properly brought as a
direct claim. (Tr. at 9.) Counsel for the statutorily non-interested trustee
defendants (the "Independent Trustee Defendants") do not concede this point.
(Id. at 38, 42. ) The Independent Trustee Defendants' argument that Count One
must be brought as a derivative suit is unavailing. Count One alleges that
the defendants made material misrepresentations or omissions regarding their
management of the Eaton Vance Funds. (SAC ¶¶ 127-33.) Count One alleges an
injury directly to the investors who, based on the alleged misrepresentations
and omissions, continued to invest in the Eaton Vance Funds and were thereby
injured. Count One alleges an injury to the investors separate and distinct
from any injury to the Eaton Vance Funds and it is properly brought as a
direct claim rather than a derivative claim. See Jackson, 547 N.E.2d at 1148.
However, as explained above, Count One is dismissed on separate grounds.

Fund assets, the resulting loss to Fund assets is allocated differently among the various classes of shares rather than pro rata according to the number of shares held. (Tr. at 94-95.) However, Counts Two, Four, Seven, Eight, Nine, and Ten allege only that all shareholders who held shares during the class period were damaged as a result of the excessive and improper fees charged to the Eaton Vance Funds, and make no effort to distinguish or assert claims particular to any group of shareholders who might have suffered a separate injury due to their status as members of a particular group of shareholders. (SAC ¶¶ 120-126, 134-40, 149-55, 169-88.) Moreover, Counts Two, Four, Seven, Eight, Nine, and Ten allege that all holders of Eaton Vance Funds during the class period suffered injury through the misuse of Eaton Vance assets. For the reasons explained above, this injury is indirect through their status as shareholders of the Funds, and therefore Counts Two, Four, Seven, Eight, Nine, and Ten must be asserted derivatively. See Lapidus, 232 F.3d at 683 (shareholders in one series of fund shares had no direct claim and claim must be brought derivatively because only injury to those shareholders was indirect).

Counts Seven, Eight, Nine, and Ten are therefore dismissed. Moreover, although Counts Two and Four are dismissed for the reasons explained above, the plaintiffs' failure to bring these

claims as derivative claims provides additional reasons for the dismissal of Counts Two and Four.

## C.

The defendants argue that Count Three should be dismissed for failure to state a claim because it concerns payments that are outside the scope of § 36(b), the excessive fees alleged were received by the brokers and therefore cannot be the basis of a § 36(b) claim against the Investment Adviser Defendants and the Trustee Defendants, and the complaint does not adequately allege excessive fees.

Section 36(b) provides, in relevant part, that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a-35(b). An advisory fee violates § 36(b) if it "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982).

The defendants argue that Count Three should be dismissed because the payments alleged in Count Three are outside the scope of § 36(b). The defendants argue that § 36(b) pertains only to excessive advisory fees, and that 12b-1 fees, soft dollar payments, and excessive broker commissions are not within the scope of § 36(b) because they are properly categorized as distribution fees rather than advisory fees.

The plaintiffs argue that the Court of Appeals for the Second Circuit has found that distribution fees may be the basis of a § 36(b) claim. In <u>Meyer v. Oppenheimer Management Corporation</u>, the Court of Appeals rejected the argument that § 36(b) has no application to Rule 12b-1 payments because § 36(b) deals only with advisory payments. <u>Meyer v. Oppenheimer Mgmt. Corp.</u>, 764 F.2d 76, 82 (2d Cir. 1985). The Court of Appeals found that, "section 36(b) expressly applies to payments made to any affiliated person of the investment adviser," and that, because the brokerage defendants were affiliated persons, § 36(b) applied to 12b-1 fees that were paid to the brokerage defendants even though they were not advisory fees. <u>Id.</u>; see <u>Meyer v. Oppenheimer Mgmt., Corp.</u>, 895 F.2d 861, 866 (2d Cir. 1990) (reiterating that excessive 12b-1 payments paid to investment adviser affiliates were subject to review under § 36(b)); <u>Pfeiffer v. Bjurman</u>, No. 03 Civ. 9741, 2004 WL 1903075, at *4

(S.D.N.Y. Aug. 26, 2004); see also ING Principal Protection Funds Derivative Litigation, 369 F.Supp.2d 163, 167-69 (D. Mass. 2005).

However, Count Three must be dismissed because it fails to allege that the defendants charged excessive fees.  Pursuant to Rule 8 of the Federal Rules of Civil Procedure, the plaintiffs must plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," that gives "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (citation omitted); see also Pfeiffer, 2004 WL 1903075 at *3 (applying Rule 8 and finding some claims sufficient under § 36(b)); Yampolsky v. Morgan Stanley Investments, No. 03 Civ. 5710, 2004 WL 1065533, at *2 (May 12, 2004) (applying Rule 8 and dismissing claim under § 36(b)).  In order to state a claim under § 36(b), the plaintiffs must allege that the defendant violated its fiduciary duty under § 36(b) by receiving fees that were "so disproportionately large" that they bore "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  Meyer, 895 F.2d at 866 (internal citation omitted); see also ING, 369 F.Supp.2d at 168; In re Nuveen Fund Litig., No. 94 C 360, 1996 WL 328006, at *14-*15 (N.D. Ill. Jun. 11, 1996).  To make this determination, the Court should consider all pertinent facts, including: (1) the nature and quality of the services provided by the advisers to

the shareholders; (2) the profitability of the mutual fund to the adviser-manager; (3) "fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders; (5) comparative fee structures with other similar funds; and (6) the independence and conscientiousness of the mutual fund's outside trustees. Gartenberg, 694 F.2d at 929-30; ING, 369 F.Supp.2d at 168; Yamplosky, 2004 WL 1065533, at *1.

Here, the plaintiffs do not allege any facts that would demonstrate that the compensation paid to the defendants was disproportionate to the services rendered. Instead, Count Three states only that the defendants improperly charged certain distribution fees. (SAC ¶¶ 141-48.) Indeed, at argument of the motions, the plaintiffs' counsel conceded that their argument that the fees were excessive was based on their argument that the fees were used for improper purposes. (Tr. at 63-64.) The allegations that the defendants authorized improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds. See, e.g., Meyer, 895 F.2d at 866; Gartenberg, 694 F.2d at 928-29. Because the allegations in the SAC contain no specific facts that would

34

provide a factual basis for an allegation that the fees were "so
disproportionately large" that the bore "no reasonable
relationship to the services rendered and could not have been the
product of arm's-length bargaining," the plaintiffs have failed
to state a claim under 36(b).  See Gartenberg, 694 F.2d at 928;
Yamplosky, 2004 WL 1065533, at *2; ING, 369 F.Supp.2d at 167-69;
Nuveen, 1996 WL 328006 at *14-*15.  Therefore, Count Three is
dismissed for failure to state a claim upon which relief can be
granted.

Count Three must also be dismissed against the Investment
Adviser Defendants and the Trustee Defendants because, § 36(b)(3)
provides that claims may only be brought under § 36(b) against
the recipient of the allegedly excessive fees.  See 15 U.S.C.
80a-35(b)(3); Halligan v. Standard & Poor's/Intercapital, Inc.,
434 F.Supp. 1082, 1083-84 (E.D.N.Y. 1977); Nuveen, 1996 WL 328006
at *13-*15.  Although the plaintiffs may bring claims under §
36(b) for excessive distribution fees, those claims must be
brought against the recipients of the fees.  See, e.g., Meyer,
764 F.2d 76 (refusing to dismiss action brought under 36(b) for
excessive advisory and distribution fees brought against brokers
and advisors who received fees at issue); Meyer, 895 F.2d at 866;
Pfeiffer, 2004 WL 1903075, at *4 (refusing to dismiss § 36(b)
claim for distribution fees paid to defendant).

At oral argument, the counsel for the defendants acknowledged that, were Count Three properly pleaded, it could be brought against EVD as a recipient of the 12b-1 fees, but argued that Count Three was not properly brought against the Investment Adviser Defendants and the Trustee Defendants because they were not recipients of the allegedly improper fees. (Tr. at 24.) EVD received 12b-1 fees and unaffiliated brokers allegedly received improper payments. The plaintiffs argue that the Investment Adviser Defendants and the Trustee Defendants benefited from the distribution fees indirectly, because the fees were used to increase the assets under management and therefore increase the size of the fees payable to the Investment Adviser Defendants, which are calculated as a percentage of assets under management. (Opp. Mem. at 35-46.) However, by its terms § 36(b)(3) limits § 36(b) claims to the recipients of the compensation or payments. It thereby excludes claims that are brought against investment advisers for alleged breaches of fiduciary duties that indirectly resulted in higher fees for the investment advisers. See, e.g., Fogel, 668 F.2d at 112 (finding that action for breach of fiduciary duty for nondisclosure to independent directors of opportunities available to Fund did not fall under § 36(b) "even though a motivation for and the effect of the nondisclosure were to increase the gross fees by stimulating growth of the Fund and the net fees both by this and by obtaining from brokers

'research' services which the Adviser would otherwise have had to supply at its own cost"). Therefore, in addition to the reasons explained above, Count Three is dismissed against the Investment Adviser Defendants and the Trustee Defendants because they were not the alleged recipients of the disputed payments.

D.

The defendants and nominal defendants argue that Count Five should be dismissed because the plaintiffs have failed to comply with Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1").[6] Count Five is a derivative claim on behalf of the Eaton Vance Funds against the Investment Adviser Defendants under § 215 of the IAA for violations of § 206 of the IAA. It seeks to rescind the investment advisory contracts with the Investment Adviser Defendants and to recover past fees paid.

Rule 23.1 requires that the complaint in a derivative suit "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

---

[6] The nominal defendants also argue that there is an irreconcilable conflict of interest between the plaintiffs' derivative claims and the plaintiffs' direct claims. (Memorandum of Law in Support of Motion of Nominal Defendants to Dismiss Derivative Claims of Second Amended Complaint, filed Oct. 26, 2004, at 10-11.) Because the Court is dismissing the non-derivative claims, it is unnecessary to reach this argument.

Fed.R.Civ.P. 23.1.  The Supreme Court has recognized that the demand requirements for a derivative suit are determined by the law of the state of incorporation.  See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98-101 (1991) (finding that substantive corporation law of state of incorporation determines whether or not demand requirements of Rule 23.1 have been met); see also In re Polymedica Corp., No. 01-3446, 2002 WL 1809095, at *7 (Mass. Super. July 16, 2002).

   Under Massachusetts law, before filing a derivative action on behalf of a corporation, a plaintiff "must establish that . . . all available means to obtain relief through the corporation itself are exhausted by making demand on the corporation's board of directors to prosecute the litigation."  See Harhen v. Brown, 730 N.E.2d 859, 865 (Mass. 2000) (internal citation omitted).  A plaintiff may seek to have the demand requirement excused as futile "if a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested."  Id.; see also, Cote v. Levine, 754 N.E.2d 127, 131-32 (Mass. App. Ct. 2001); Polymedica, 2002 WL 1809095 at *7; ING, 369 F.Supp.2d at 171-72.  Under Massachusetts law, "[a] trustee of a trust who with respect to the trust is not an interested person, as defined in [the ICA] shall be deemed to be independent and disinterested when making any determination or taking any action as a trustee."  Mass Gen. Laws ch. 182 § 2B; see also ING, 369 F.Supp.2d at 171-

72 (applying Mass. Gen. Laws ch. 182 § 2B to determine if demand was excused in derivative case brought on behalf of mutual funds). The ICA, in relevant part, provides that a trustee is an interested person if the trustee is an "affiliated person" – that is, if the trustee is "controlled by" by the investment adviser. See 15 U.S.C. § 80a-2(a)(3), (19). The ICA defines "control" as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company," and provides that, "[a] natural person shall be presumed not to be a controlled person within the meaning of this subchapter." See 15 U.S.C. § 80a-2(a)(9).

The plaintiffs allege that the trustees are interested because each of the trustees was appointed by the Investment Adviser Defendants and is therefore "beholden to the Investment Adviser Defendants for his/her position and substantial compensation as a Trustee." (SAC ¶ 101.) The plaintiffs allege that, "[b]ecause of their lack of independence from the Investment Adviser Defendants, Trustee Defendants wrongfully approved the adviser fees, 12b-1 fees, Soft Dollars and the materially misleading disclosures in the Eaton Vance Fund Prospectuses in each of the years they served as Directors." (SAC ¶ 102.) The plaintiffs also allege that the trustees are incapable of making an independent decision with regard to whether the bring this

derivative claim because "the Trustee Defendants would be required to sue themselves and their fellow Trustees with whom they have had close business relationships for nearly 20 years." (SAC ¶ 108.)

These allegations are insufficient to excuse the demand requirement under Massachusetts law. The fact that a defendant appointed a board member is insufficient to establish that the board member is interested, even if the position provides the board member with compensation. See Demoulas v. Demoulas Super Markets, Inc., No. 033741BLS, 2004 WL 1895052, at *15 (Mass. Super. Aug. 2, 2004). Moreover, the threat of personal liability for approving a transaction and the possibility of being sued individually is insufficient to demonstrate that a board is interested for the purposes of excusing the demand requirement. See Heit v. Baird, 567 F.2d 1157, 1162 (1st Cir. 1977); In re Kauffman Mut. Fund Actions, 479 F.2d 257, 265 (1st Cir. 1973) ("Where mere approval of the corporate action, absent self-interest or other indication of bias, is the sole basis for establishing the directors' 'wrongdoing' and hence for excusing demand on them, plaintiff's suit should ordinarily be dismissed."); ING, 369 F.Supp.2d at 171-72.

The plaintiffs acknowledge these arguments, but respond that this is a rare case in which a transaction "may be so egregious on its face that board approval cannot meet the test of business

judgment, and a substantial likelihood of director liability therefore exists." Aronson v. Lewis, 473 A.2d 805, 815 (Del. 1984). To demonstrate such a situation under Massachusetts law, a complaint must demonstrate that the transaction alleged was "completely undirected to a corporate purpose" such that "the nature of the misconduct acquiesced in impeached the [trustees'] motives." Heit, 567 F.2d at 1160-61 (citing Kauffman, 479 F.2d at 265). The plaintiffs attempt to meet this requirement by alleging that "[g]rowth of a mutual fund is one of the keys to its survival," and that, if the mutual fund disbanded, the board members would lose their positions on the board. (SAC ¶ 105.)

The plaintiffs' argument is without merit. The alleged transaction may have served any entirely proper corporate purpose – indeed, the plaintiffs admit in the SAC that the growth of a mutual fund is "one of the keys to its survival." (SAC ¶ 105.) Because the transaction cannot be said to be "completely undirected to a corporate purpose," it cannot support an allegation that the trustees that approved it were interested for the purposes of excusing the demand requirement. See Heit, 567 F.2d at 1161; Kauffman, 479 F.2d at 257. Because the plaintiffs have failed to plead with particularity why demand was excused, Count Five is dismissed.

E.

Count Six must be dismissed on the grounds that N.Y. Gen. Bus. L. § 349 does not apply to securities transactions, even when those actions are brought as claims by "holders" of shares.  See In re Motel 6 Litigation, 93 Civ. 2183, 1995 WL 431326, at *6-*7 (S.D.N.Y. July 20, 1995) (dismissing N.Y. Gen. Bus. L. § 349 claim brought by holders of call options against participants in alleged insider trading scheme); Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 689 (S.D.N.Y. 1991), aff'd, Yaeger v. Nat'l Westminster Bank, U.S.A., 962 F.2d 1 (2d Cir. 1992).

F.

As explained above, Count Six is dismissed because N.Y. Gen. Bus. L. § 349 does not apply to securities transactions, and Counts Seven, Eight, Nine, and Ten are dismissed because they should have been brought as derivative claims.  However, these claims must also be dismissed because they are preempted.

The defendants argue that the plaintiffs' state law claims are preempted by the Securities Litigation Uniform Standards Act ("SLUSA").  SLUSA provides that a state law claim must be dismissed as completely preempted if: 1) the lawsuit is a "covered class action"; 2) the claim is based upon state law; 3) the claim concerns a "covered security"; and 4) the plaintiff alleges either a misrepresentation or omission of a material fact or a manipulative or deceptive device or contrivance that is "in

connection with the purchase or sale of a covered security." 15 U.S.C. §§ 77p(b), 78bb(f)(1). The plaintiffs dispute that the fourth criterion is met, arguing that the claims have not been brought "in connection with the purchase or sale of a covered security" because the plaintiffs have brought claims as holders of a security. (Opp. Mem. at 53-59.)

In Dabit v. Merril Lynch, Pierce, Fenner & Smith, Inc., the Court of Appeals for the Second Circuit held that the phrase "in connection with the purchase or sale of a covered security" should be interpreted in the context of SLUSA to have the same meaning as in § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). See Dabit v. Merril Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 28 (2d Cir. 2005). The Supreme Court interpreted the phrase "in connection with the purchase or sale" of a security in the context of § 10(b) of the Exchange Act to exclude claims that alleged a misrepresentation that caused a shareholder simply to hold stock, rather than to buy or sell shares. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 754-55 (1975). Accordingly, the Dabit Court held that, in order to be preempted by SLUSA, "an action must allege a purchase or sale of covered securities made by the plaintiff or members of the alleged class . . . ." Dabit, 395 F.3d at 43-44; see also Atencio v. Smith Barney, No. 04 Civ. 5653, 2005 WL 267556, at *4 (S.D.N.Y. Feb. 2, 2005).

The _Dabit_ Court also found that, where a plaintiff alleges that the plaintiff purchased and retained stock as a result of the alleged misrepresentation or omission, the claim satisfies the standard set forth in _Blue Chip_ and falls within the preemptive scope of SLUSA. _See Dabit_, 395 F.3d at 44-45; _see also Atencio_, 2005 WL 267556 at *4. Such claims are preempted even where the plaintiff "forswears _damages_ from the purchase and seeks only 'holding damages'" because SLUSA "preempts claims 'alleging' fraud in connection with the purchase or sale, and not merely claims seeking damages specifically traceable to the initial purchase." _Dabit_, 395 F.3d at 45; _see also Atencio_, 2005 WL 267556 at *4. Moreover, where "the complaint does not include sufficient information to permit the court to identify and separate the preempted and non-preempted subclasses, . . . the proper approach will ordinarily be to dismiss the entire claim pursuant to SLUSA." _Dabit_, 395 F.3d at 46; _see also Atencio_, 2005 WL 267556 at *5.

Here, the proposed Class fails to distinguish between members whose claims are preempted under SLUSA and those whose claims are not preempted under _Dabit_. The proposed Class consists of persons who "held" shares of the Funds at any time during the class period. (SAC ¶ 120.) Although the plaintiffs disavow claims based on the purchase or sale of shares, the class definition makes no attempt to exclude class members who have

purchased or sold shares during that time period.  Because the
SAC alleges that the actions of the defendants that are the
subject of the plaintiffs' claims steered purchasers into buying
shares of the Fund, the claims of class members who purchased
shares during the class period are inextricably related to their
purchases of shares of those funds and are preempted by SLUSA.
See Dabit, 395 F.3d at 45-46; Atencio, 2005 WL 267556 at *5-*6.
Because the complaint does not include sufficient information to
permit the court to identify and separate preempted and non-
preempted subclasses, the plaintiffs' state law claims must be
dismissed.  See Dabit, 395 F.3d at 46; Atencio, 2005 WL 267556 at
*5-*6 (finding that state law claims of class defined as "all
persons and entities who held shares" of funds during class
period and specifically excluded claims based on the purchase or
sale of shares of funds during class period nonetheless were
preempted by SLUSA).  In this case, the alleged class is not even
as restricted as the purported class in Atencio.  It plainly
includes persons who purchased during the class period and then
held the shares.  Thus, these claims must be dismissed under
SLUSA as interpreted in Dabit.

Therefore, in addition to the reasons stated above, Counts
Seven, Eight, Nine, and Ten are dismissed because, as pleaded,
they are preempted by SLUSA.

V.

In their Reply to the defendants' Opposition to the
plaintiffs' Motion to Strike, the plaintiffs ask for leave to
amend the SAC (Reply to Stike at 7 n.3). Generally, leave to
amend should be "freely given when justice so requires."
Fed.R.Civ.P. 15(a). However, "a motion to amend should be denied
if there is an 'apparent or declared reason – such as undue
delay, bad faith or dilatory motive ..., repeated failure to cure
deficiencies by amendments previously allowed, undue prejudice to
the opposing party by virtue of the allowance of the amendment,
[or] futility of amendment.'" See Dluhos v. Floating and
Abandoned Vessel Known as New York, 153 F.3d 63, 69 (2d Cir.
1998) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). Here,
the plaintiffs have had two opportunities to cure the defects in
their complaints, including a procedure through which the
plaintiffs were provided notice of defects in the Consolidated
Amended Complaint by the defendants and given a chance to amend
their Consolidated Amended Complaint. In particular, the
plaintiffs were on notice that the pleading requirements for
Count Three were not met in their Consolidated Amended Complaint
before the plaintiffs submitted the SAC. (Strike Reply at 4.)
Moreover, there is a strong argument that amendment would be
futile. Counts One, Two, and Four are dismissed because there is
no private right of action under §§ 34(b), 36(a), and 48(a) of

the ICA, and Count Five is dismissed for failure to make a demand, which cannot be cured by making a demand after a derivative suit has been initiated.  <u>Shlensky v. Dorsey</u>, 574 F.2d 131, 141-42 (3d Cir. 1978).

The remaining state law claims are dismissed for independent reasons.  Count Six fails to state a claim under N.Y. Gen. Bus. L. § 349.  Counts Seven through Ten were improperly pleaded as direct rather than derivative claims and all of the state law claims are preempted under SLUSA.  Moreover, because all of the federal claims are dismissed, the Court would not exercise supplemental jurisdiction over purely state law claims.  <u>See</u> 28 U.S.C. § 1367(c)(3); <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 304-06 (2d Cir. 2003).

The plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects.  The motion to amend is therefore denied because of the plaintiffs' failure to cure deficiencies despite the opportunities to do so, and the failure to show how any amended complaint could cure the deficiencies.  <u>See</u> <u>Dluhos</u>, 153 F.3d at 69.


CONCLUSION

The plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects. The motion to amend is therefore denied because of the plaintiffs' failure to cure deficiencies despite the opportunities to do so, and the failure to show how any amended complaint could cure the deficiencies. See Dluhos, 153 F.3d at 69.

## CONCLUSION

For the reasons stated above, the plaintiffs' second amended complaint is dismissed in its entirety.[7] The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated:**     **New York, New York**
              **July 29, 2005**

                                        John G. Koeltl
                               United States District Judge

---

[7] Because the Court dismisses all claims, it is unnecessary to reach the additional arguments put forth by the defendants, the independent trustee defendants, defendant Orbimed, and defendant Jessica M. Bibliowicz.